**John Joseph WHITE, Jr., et al.**

v.

**Joseph T. EDGAR, Secretary of State, et al.**

Supreme Judicial Court of Maine.

May 7, 1974.

Neville Woodruff, Portland, Donald F. Fontaine, Presque Isle, for plaintiffs.

John W. Benoit, Jr., Deputy Atty. Gen., Courtland Perry, William Kelleher, Asst. Attys. Gen., Augusta, Hugh Calkins, Portland, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

The District Court of the United States, District of Maine, convened as a three-judge Court pursuant to 28 U.S.C. § 2281, has "certified" two questions to us for our "instructions" concerning the law of Maine.[1]

In the certificate

". . . the nature of the case and the circumstances out of which . . . questions of law of the State of Maine arise"

are described as follows.

---

[1] "Certification" to this Court is authorized by 4 M.R.S.A. § 57, as amended, in the following pertinent language:

"When it shall appear to the Supreme Court of the United States, or to any court of appeals or district court of the United States, that there are involved in any proceeding before it one or more questions of law of this State, which may be determinative of the cause, and there are no clear controlling precedents in the decisions of the Supreme Judicial Court, such federal court may certify any such questions of law of this State to the Supreme Judicial Court for instructions concerning such questions of state law, which certificate the Supreme Judicial Court sitting as a law court may, by written opinion, answer."

Rule 76B M.R.C.P. establishes procedure in certification situations.

". . . On October 3, 1972, the plaintiffs John Joseph White, Jr., Donald Everett Cunningham, Timothy Francis Flaherty, Peter D. Riddell, Louis George Fournier, all persons serving sentences at the Maine State Prison, filed a complaint under the civil rights jurisdiction of the federal district court alleging that the defendant, the Secretary of State of the State of Maine, the Commissioner of the Maine Department of Mental Health and Corrections, and the Clerk of the City of Portland, had together deprived the plaintiffs of their right to vote in federal, state, and local elections. On December 18, 1972, the plaintiffs filed their 'Amended and Supplemental Complaint,' adding as parties defendant the Director of the Bureau of Corrections and the Warden of Maine State Prison, and setting out new facts relating to the November 7 elections of 1972. The Fourth claim for relief was based on an alleged violation of the Constitution of the State of Maine. . . .

". . . In the month of January, 1973, each of the defendants filed ANSWERS to the Amended and Supplemental Complaint, denying many of the plaintiffs' allegations. ˙. . .

". . . On February 5, 1973, Judge Edward T. Gignoux granted, without objection, plaintiffs' request for leave to maintain the action as a class action on behalf of persons who are registered voters of Portland, Maine, who have been or will be absolutely precluded from voting by the administrative actions of the defendants and by the enforcement of 21 M.R.S.A. § 1(1) during their service of a sentence at the Maine State Prison. . . .

". . . On July 17, 1973, the parties entered into thirty-five 'STIPULATIONS OF FACT.' They were filed with the United States District Court on that day and constitute the complete factual record in this case. . . ."

The "Stipulations of Fact" add the further details that the present controversy began in late September, 1972. All of the plaintiffs, while serving sentences at the Maine State Prison,[2] were legal residents of Portland. They wished to vote in the general elections to be held in November, 1972.[3]

Having received legal advice, plaintiffs obtained appropriate voter registration forms. On September 21, 1972 their attorney took the forms to the Board of Voter Registrars of the City of Portland and tendered them to the then chairperson of the Board, Mrs. Harriet Petersen (now deceased). She refused to accept the registration cards. When the attorney insisted that his clients were entitled to register, Mrs. Petersen, by telephone, consulted the Elections Division of the office of the Secretary of State. The Division informed her that she was legally authorized, if she chose, to refuse registration to the plaintiffs. Accordingly, Mrs. Petersen adhered to her original position.

Plaintiffs' attorney thereupon wrote to Secretary of State, Joseph T. Edgar, explaining the reasons for his opinion that plaintiffs were entitled to register to vote, and to vote. The letter requested of Mr. Edgar that he advise, first, Mrs. Petersen that she was under legal duty to register plaintiffs and, second, the Clerk of the City of Portland, Arthur Duffett, that he must afford to plaintiffs some means by which, once registered, they would be en-

---

2. None of the plaintiffs had been convicted of a crime related to the electoral or political process or had been adjudicated to be incompetent or unqualified to vote. Plaintiff, Louis George Fournier, was released from custody subsequently to the filing of the original complaint but prior to the filing of the "Amended and Supplemental Complaint."

3. Later, plaintiffs also expressed interest in voting in the Portland Municipal election to be held on December 4, 1972. Their efforts to vote in that municipal election met with the same frustrations hereinafter more fully described relative to the November, 1972 general elections.

abled to vote. The attorney suggested, as alternatives, establishment of a polling place at the Prison or furnishing plaintiffs with absentee ballots.

Writing to Portland City Clerk Duffett, plaintiffs' attorney directly requested him to establish a polling place at the Prison or provide absentee ballots to plaintiffs. In a letter to the Commissioner of the Department of Mental Health and Corrections, William F. Kearns, the attorney for plaintiffs offered a third alternative:—that Commissioner Kearns direct the Warden of the Maine State Prison, Garrell S. Mullaney, to transport plaintiffs to the polls under State Prison escort.

The letter received by Secretary of State Edgar induced him to confer with the office of the Attorney General. On September 28, 1972, Mr. Edgar informed Mrs. Petersen that (1) contrary to prior information given her, Mr. Edgar's present opinion was that plaintiffs must be allowed to register as voters; and (2) except as to the voting for the offices of President and Vice President of the United States, absentee ballots should be withheld from plaintiffs. Mr. Edgar reasoned that the Federal Voting Rights Act Amendments of 1970, 42 U.S.C.A. § 1973aa–1 control voting for the offices of President and Vice President of the United States, requiring that plaintiffs be given absentee ballots to enable them to vote for those offices. Otherwise, the State law of Maine governs, and 21 M.R.S.A. § 1(1) plainly and explicitly states:

"A person who is serving a sentence in a jail or penal institution is not an absentee voter."

Subsequently, Peter Damborg, Deputy Secretary of State, Elections Division, gave the same advice to all city, town, and plantation Clerks, Registers of Voters, and Boards of Registrars. They were notified, too, that concerning the voting for the offices of President and Vice President of the United States special absentee ballots were being printed to be available, as needed, upon request addressed to Mr. Damborg's office.

On October 2, 1972 Mrs. Petersen accepted the registration cards of the plaintiffs and duly registered them.

Portland City Clerk Duffett and Commissioner Kearns persisted in disavowing legal authority and practical ability to provide the means to enable plaintiffs to cast their votes.[4] Mr. Duffett's position was that (1) *he* lacked legal authority to establish a voting place at the Maine State Prison and (2) except as to voting for offices of President and Vice President of the United States, he was required by law under 21 M.R.S.A. § 1(1) to deny "absentee voter" status to plaintiffs. Commissioner Kearns and Warden Mullaney stated that they would be willing to have a polling place established at the Prison but they believed that *they* lacked the legal authority to do it. They considered transporting prisoners to the polls practically unrealistic, especially as to a state-wide general election, since it would entail financially prohibitive costs and the physical unmanageability incident to transporting on a single day prisoners to polling places situated throughout the State.[5]

It thus eventuates, as the practical reality, that the obstacle to voting by the plain-

4. In addition to the alternative methods suggested by their attorney, each of the plaintiffs invoked a further option by requesting permission to travel "on furlough" to vote. All of these requests were denied on the ground that none of the plaintiffs had a good work record within the Prison and, therefore, did not meet, the requirements minimally necessary to establish eligibility for furlough. Beyond this, however, the corrections officials maintained that to give a prisoner a "fur-

lough" for no reason other than to allow him to vote would be wrong in principle insofar as a "furlough" should be granted because a prisoner has arrived at a particular stage of the rehabilitation process; and, in any event, the grant of furlough for voting to a large number of prisoners is an impracticability since, as to a general state-wide election, all the furloughs would be on the same day.

5. The entire class here represented by plaintiffs embraces only those prisoners who are

tiffs is the ostensible validity of 21 M.R.S.A. § 1(1).[6] By definitionally excluding plaintiffs as absentee voters, the statute deprives them of a mechanism easily administered and capable of ready availability to plaintiffs (if not denied to them by law) by which plaintiffs would be enabled to vote even though confined in the State Prison.

In their Amended and Supplemental Complaint of December 18, 1972 plaintiffs undertook to eliminate 21 M.R.S.A. § 1(1) as the bar to their voting by having it nullified as violative of the First, Eighth, Ninth, and Fourteenth Amendments to the Constitution of the United States. In addition, calling upon the federal Court's "pendent" jurisdiction to decide questions of state law, plaintiffs asked an adjudication that the statute transgresses Article II, Section 1 of the Constitution of Maine.

One of the two questions certified is directed to this provision of the Maine Constitution explicitly mentioned by plaintiffs in their pleadings. It is:

". . . Is 21 M.R.S.A. § 1(1) inconsistent with Article II, § 1 of the Constitution of the State of Maine?" [7]

registered voters of Portland, Maine. Although less severe practical problems would be encountered in transporting to the polls a class thus limited, the Corrections officials believed that if only that part of the Prison population consisting of Portland voters were to be transported to the polls ". . . the feeling of discrimination that would prevail in the Prison . . . would be potentially dangerous."

6. In its entirety 21 M.R.S.A. § 1(1) provides: "'Absentee Voter' means a person who is unable to cast his ballot in the municipality in which he is registered to vote, for one of the following reasons: Absence from the municipality during the time the polls are open on election day; physical incapacity not adversely affecting his soundness of mind; religious belief which prohibits his doing so; and unreasonable distance from the polls, if he is a resident of a township. A person who is serving a sentence in a jail or penal institution is not an absentee voter."

7. Article II, Section 1 of the Constitution of Maine, as amended, was, pursuant to Article

The other certified question concerns another provision of the Constitution of Maine—Article II, Section 4—not invoked by plaintiffs in their pleadings. It is, however, a question capable of falling within the federal Court's "pendent" jurisdiction to decide insofar as the "single cause of action" standard of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933) has been refashioned by United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) into the expanded criterion that

"[t]he state and federal claims . . . derive from a common nucleus of operative fact"

and

". . . if, considered without regard to their federal or state character, . . . plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, . . . ." (p. 725 of 383 U.S., p. 1138 of 86 S.Ct.)

See also: Concurring opinion of Mr. Justice Douglas in Rosado v. Wyman, 397 U.S. 397, 423, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). This second certified question is:

X, Section 6 of said Constitution, arranged in 1973 by the Chief Justice of the Supreme Judicial Court. See also, Opinion of the Justices, Me., 303 A.2d 452 (1973). As thus arranged Article II, Section 1, as amended, provides:

"Every citizen of the United States of the age of eighteen years and upwards, excepting persons under guardianship for reasons of mental illness, having his or her residence established in this State, shall be an elector for Governor, Senators and Representatives, in the city, town or plantation where his or her residence has been established, and he or she shall continue to be an elector in such city, town or plantation for the period of three months after his or her removal therefrom, if he or she continues to reside in this State during such period, . . . . ."

The section proceeds further to make special provision for persons absent in the military and for Indians residing on tribal reservations. In its second paragraph, § 1 limits the right to vote to those who are able to read the Constitution in English and to write their names, unless the inability to do so is due to physical disability.

". . . Is 21 M.R.S.A. § 1(1) inconsistent with Article II, § 4 of the Constitution of the State of Maine?" [8]

, It is our decision to respond to each of the questions certified. To each question we answer in the negative.

2.

As more fully explained hereinafter, the instant certification is substantially different in kind from those we have previously encountered. For this reason, we have approached the present situation cautiously. We have arrived at our decision to answer only after having explored in depth the nature and the objectives of "certification" as a state-proferred instrumentality of cooperation, for mutual benefit, between this Court and the federal judiciary in the variety of contexts in which the legitimate scope of federal jurisdiction exposes the federal Courts to questions of the law of this State.

We believe it will contribute to the furtherance of harmonious relationships between this Court and the federal judiciary if we here discuss some of the conclusions to which our investigations have led.

Our three prior experiences with certification were: Norton v. Benjamin, Me., 220 A.2d 248 (1966); In Re Richards, Me., 223 A.2d 827 (1966) and Pierce v. Secretary of United States Department of Health, Education and Welfare, Me., 254 A.2d 46 (1969). In each of those cases the certified question of State law projected alternatives of answer at least one of which, were it to eventuate as the answer given by this Court, would controllingly affect *decision* of the *federal merits* of the cause.[9]

By contrast, here, the certified questions of State law can have no governing impact upon the *decision* of the *federal merits* of the case. The federal merits pertain to whether a Maine statute, 21 M.R.S.A. § 1(1), contravenes the Constitution of the United States. As to this, there is not even a state law question of the *meaning* of the Maine statute under attack since 21 M.R.S.A. § 1(1), as here involved, is clear and unequivocal. Here absent, then, is any reasonable possibility that state court construction of 21 M.R.S.A. § 1(1) will avoid, or modify, the ultimate federal constitutional issue.[10] In the instant situation the

---

8. Maine Constitution, Art. II, § 4, in pertinent part, provides:

"The Legislature under proper enactment shall authorize and provide for voting by citizens of the State absent therefrom in the Armed Forces of the United States or of this State and for voting by other citizens absent or physically incapacitated for reasons deemed sufficient."

9. In Norton v. Benjamin, supra, this was the situation because the federal jurisdiction was predicated on diversity of citizenship; and as to the State law question having potential to bar the cause of action, under Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) the federal Court would be acting as ". . . in effect, only another Court of the State." Angel v. Bullington, 330 U.S. 183, 187, 67 S.Ct. 657, 659, 91 L.Ed. 832 (1947).

In *In Re Richards*, supra, the federal bankruptcy jurisdiction was involved and operated with similar effect—insofar as the federal bankruptcy statute had, in essence, absorbed the law of Maine into itself thus to give it an ultimately federally controlling impact on the federal merits.

Likewise, in Pierce v. Secretary of the United States Department of Health, Education and Welfare, supra, the federal jurisdiction was "federal question" jurisdiction and the federal statute precipitating the federal question, the federal social security law, had fundamentally absorbed into itself particular facets of the law of Maine thus to give them a controlling effect on the ultimate federal merits.

10. Precisely for this reason, no doubt, the federal Court has not certified to us a question seeking our interpretation of the meaning of 21 M.R.S.A. § 1(1).

That the State statute under attack as being in contravention of the Constitution of the United States may reasonably be deemed susceptible of a limiting construction by the State Court which will avoid, or modify, the federal constitutional issue has long been recognized to warrant federal abstention. Railroad Comm'n v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959); Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) and Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444

state law questions are certified solely because they project alternatives of answer at least one of which, if it be the answer forthcoming from this Court, will produce a final disposition of the cause in which a decision of the federal merits is made unnecessary, rather than made.

When it is necessary to a federal Court's decision of the federal merits of the cause pending before it that a question of state law be decided (in contradistinction to the instant situation in which decision of the state law question is necessary to render decision of the federal merits unnecessary), it is beyond dispute that the question of state law must be answered; only thus can the federal Court perform the function for which it was created. The problem, therefore, is not *whether* the question of state law shall be answered but *who* shall answer it, the federal or state Court?

■ In such aspect, apart from a most fundamental principle of "our federalism"[11]—that the state court of last resort is alone the supreme arbiter of the substantive content of the law of the State —a concern to promote federal-state comity would counsel that, wherever reasonably possible, the state court of last resort should be given opportunity to decide state law issues on which there are no state precedents which are controlling or clearly indicative of the developmental course of the state law. Such approach would (1) tend to avoid the uncertainty and inconsistency in the exposition of state law caused when federal Courts render decisions of State law which have an interim effectiveness until the issues are finally settled by the state court of last resort; and (2) minimize the potential for state-federal tensions arising from actual, or fancied, federal Court efforts to influence the development of State law.[12]

■ Since certification is an instrumentality which achieves these objectives while simultaneously avoiding the disadvantages produced by federal abstention (as a practice calculated to attain similar goals),[13] in

(1967). More recently this context has been referred to as the unquestioned "paradigm" of requisite federal abstention. Lake Carriers' Assn. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972) and Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).

In Stavis Ipswich Clam Co. v. Green, 283 F.Supp. 586 (1968) the United States District Court, District of Maine, convened as a three-Judge tribunal, abstained on such ground. In a subsequent proceeding independently originated in the State Court system, the Maine statutes at issue were interpreted by this Court. Stavis Ipswich Clam Co. v. Green, Me., 236 A.2d 708 (1968). The three-Judge District Court then decided that, even as thus construed, the Maine statutes violated the Constitution of the United States. Stavis Ipswich Clam Co. v. Green, 283 F.Supp. 586 (1968).

It is not clear why the three-Judge Court in Stavis Ipswich Clam Co. v. Green, supra, saw fit to resort to abstention instead of certification under 4 M.R.S.A. § 57. Perhaps, some language appearing in In Re *Richards*, supra, had caused a confusion which induced the federal tribunal to become hesitant about using certification. See: 2 Field, McKusick & Wroth, Maine Civil Practice, 2nd Ed., pp. 248, 249. Our discussion in the instant opinion should remove any lingering traces of that confusion.

11. In Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) "our federalism" is described as connoting:

". . . a proper respect for state functions, a recognition . . . that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. . . . the concept . . . represent[s] . . . a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." (p. 44 of 401 U.S., p. 750 of 91 S.Ct.)

12. A recent example of these problems in connection with the federal judiciary's "diversity of citizenship" jurisdiction is Lehman Brothers v. Schein et al., —— U.S. ——, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974).

13. One most obvious weakness of "abstention" is that

". . . the cost . . . to the litigants may prove to be very high in terms of time,

the situation in which a decision of a question of State law is necessary to a decision of the federal merits of a cause pending in the federal Court, it is, and will continue, a strong policy of this Court, as conducive to a sound federalism and the promotion of harmonious relations between federal and State Courts, to implement the certification process afforded by 4 M.R.S.A. § 57 in the fullest scope consistent with this Court's proper functioning.

What, however, of the instant situation and others of similar nature in which decision of the state law question is unnecessary to the fulfillment of the federal Court's reason for being—decision of the merits of federal issues brought before it —but yet a decision of the state law issue,

in one alternative, will produce a final disposition of the federal Court proceeding?

■■ Initially, we look to our jurisdiction of the subject-matter. We are satisfied that the language of 4 M.R.S.A. § 57 confers jurisdiction upon this Court to respond to a certified question of State law one alternative answer to which, as the answer forthcoming from this Court, will produce a final disposition of the federal cause. If the facts of a case pending in the federal Court generate an issue of the law of this State in this posture, such state law question is "involved" in the federal proceeding within the meaning of 4 M.R.S.A. § 57; and this is so whether the state law question is explicitly raised by the litigants or is precipitated by the federal Court acting sua sponte.[14]

money, and perhaps anguish and despair. Once the federal court has abstained, the party seeking relief must often begin his lawsuit anew at the bottom of the state court hierarchy and struggle to reach the highest state court. He may be shuttled back and forth among various state and federal courts." Mattis, Certification of Questions of State Law: An Impractical Tool in the Hands of the Federal Courts, 23 U. Miami L.Rev. 717, 719 (1969)

A more subtle adverse consequence of "abstention" is:

"The practice of abstention creates the risk that future litigants seeking relief under state law might be discouraged from invoking federal question jurisdiction to vindicate a federal right intertwined with a claim for state relief, or from utilizing diversity jurisdiction, because of the anticipation that by suing in the state courts where an appeal might not be prosecuted they could obtain speedier relief than by suing in a federal court that might abstain and subject them to the cost and delay of separate journeys through two judicial systems." Note, Inter-Jurisdictional Certification: Beyond Abstention Toward Cooperative Judicial Federalism, 111 U.Pa.L.Rev. 344, 347, 348 (1963)

Other and more technical difficulties arising from abstention, especially when the federal Court retains jurisdiction pending the outcome of the State proceedings, are discussed in Note, Consequences of Abstention by a Federal Court, 73 Harv.L.Rev. 1358 (1960). Among them are questions which arise, such as,

". . . should the plaintiff ask the state court to decide only state questions, or federal questions as well? If the plaintiff raises only state issues, but the state court decides the federal issues in the case also, may the plaintiff, despite the apparent applicability of the doctrine of res judicata, return to the federal trial court and relitigate his federal claims, or is his only resource the appellate jurisdiction of the Supreme Court? May the federal court, if it wishes, prevent the state court from determining the federal issues in the case even if the plaintiff does present them for decision? . . ., does the state court have a constitutional duty to determine those issues?" (p. 1359)

Problems such as these were recently confronted by this Court in relation to an abstention by the United States District Court, District of Maine. Stavis Ipswich Clam Co. v. Green, Me., 236 A.2d 708 (1968). The difficulties are also explicitly mentioned in the subsequent decision of the three-Judge United States District Court by which the statutes, after having been construed by this Court, were held to violate the Constitution of the United States. Stavis Ipswich Clam Co. v. Green, 283 F.Supp. 586 (1968).

14. Here, one of the certified questions was not mentioned in the pleadings. Since, as stated ante (at pp. 673–674), we conceive it to be, in any event, a question which under United Mine Workers v. Gibbs, can be within the "pendent" jurisdiction of the federal Court to decide (whether or not asserted in the pleadings), we consider it "involved" in the

■ Here, the federal Court has certified to us that the questions of state law certified "appear" to be "involved" in the pending federal proceedings. Insofar as this Court is the final arbiter of its own subject-matter jurisdiction and must make the ultimate determination whether such "involvement" as "appears" to the federal Court is truly the "involvement" contemplated by the law of Maine in 4 M.R.S.A. § 57, we hold that the questions here certified are "involved" in the proceedings pending in the federal Court.

■ The other element of this Court's certification jurisdiction—that the question of state law " . . . may be determinative of the cause"—is likewise present. "Determinative of the cause" is more inclusive than "determinative of the federal merits of the cause." It encompasses *any* disposition by which the federal cause is *terminated,* thus to be *"determined."* So long, then, as the question of state law is susceptible of an answer in one alternative which, if it be the answer given by this Court, will produce a final disposition of the federal cause, and regardless of whether such disposition embodies a decision of the federal merits of the case, the question of state law "may be determinative of the cause" under 4 M.R.S.A. § 57.

This Court has jurisdiction to answer the questions here certified.

■■ Since, however, this Court has a discretion whether to exercise such jurisdiction, what are the important policy considerations?

A somewhat simplistic approach would be that because the validity of a state stat-

ute is at stake, federal-state irritations are minimized if the state judicial system is given first opportunity to determine the fate of any state statute. Yet, concern to assure federal-state comity has never been deemed so urgent as to require that the state judicial system, because it (as well as the federal) has the power and solemn responsibility to support the Constitution of the United States, shall always be the first to decide whether a state statute violates the federal Constitution. As observed by Mr. Justice Douglas in Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971):

> "Congress could . . . have routed all federal constitutional questions through the state court systems, saving to this Court [the Supreme Court of the United States] the final say when it came to review of the state court judgments. But our First Congress resolved differently and created the federal court system and in time granted the federal courts various heads of jurisdiction, which today involve most federal constitutional rights. Once that jurisdiction was granted, the federal courts resolved those questions even when they were enmeshed with state law questions." (pp. 437, 438 of 400 U.S., p. 510 of 91 S.Ct.)

> "We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal court should stay its hand and not decide the question before the state courts decided it." (p. 439 of 400 U.S., p. 511 of 91 S.Ct.)

Thus, that it is a *state* statute which is being tested for validity under the *federal*

---

federal proceedings and cognizable by us within our certification jurisdiction under 4 M.R.S.A. § 57 notwithstanding that the federal Court may have raised the question on its own motion.

We take the precaution to emphasize, however, that precisely because this question of state law here certified is within the federal Court's "pendent" jurisdiction to determine, we are not here required to decide—and we neither decide nor intimate opinion on—

whether a state law issue *not* within the "pendent" jurisdiction of the federal Court to decide and which the federal Court yet sees fit to bring forward as a question which in one alternative of answer will produce a final disposition of the federal cause (without need for a decision on the federal merits) constitutes a question of state law legally capable, within the contemplation of 4 M.R.S.A. § 57, of being "involved" in the federal Court proceeding.

Constitution has been persistently rejected as ipso facto sufficient to mandate that such *federal* claim be initially resolved by the state judiciary. Turner v. City of Memphis, 369 U.S. 350, 82 S.Ct. 805, 7 L. Ed.2d 762 (1962); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); see: Procunier v. Martinez, —— U.S. ——, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

It is reasonably arguable, however, that when the validity of a state statute is under attack not only for violation of the federal Constitution but also for contravention of the State Constitution, sound policy requires that the issues under the State Constitution be decided by the state judiciary before the federal judiciary proceeds to vindicate the federal constitutional claim. By such practice not only will the potential for state-federal tensions be minimized but also a strong internal federal adjudicative policy will be supported:—that federal constitutional issues should not be decided if they may be reasonably avoided.

Recent discussions of this problem by the Supreme Court of the United States—at least as concerned with federal "abstention" to allow state court decision of questions arising under a State Constitution which, on one alternative of decision, will obviate the necessity of a federal determination of the federal constitutional issues—reveal much uncertainty.

Meridian v. Southern Bell T. & T. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959) could be interpreted to require abstention in such circumstances. This view is questionable, however, because the state statute involved in *Meridian* was susceptible of a construction which would make it inapplicable to the public utility in question. Were the statute so construed by the state court of last resort, both the state and federal constitutional issues would disappear. The decision in *Meridian* relied heavily on this facet of the case, the Court stating:

> " . . . when the state court's interpretation of the statute . . . may obviate any need to consider its validity under the Federal Constitution, the federal court should hold its hand, lest it render a constitutional decision unnecessarily." (p. 641 of 358 U.S., p. 457 of 79 S.Ct.)

Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) seems an unequivocal decision that a federal Court abuses its discretion if it declines to abstain to allow the state court to decide issues which (1) are raised under provisions of the State Constitution projecting a content specially and uniquely different from that of the potentially controlling provisions of the federal Constitution and (2) are answerable in one alternative which will obviate the necessity of a decision of the federal constitutional issues.[15]

Within nine months after Reetz v. Bozanich was decided the Court seemed bent

15. In Department of Social Services of Iowa v. Dimery, 398 U.S. 322, 90 S.Ct. 1871, 26 L.Ed.2d 265 (1970), decided approximately four months after Reetz v. Bozanich, the Court vacated the judgment of a District Court of the United States convened as a three-judge Court and remanded the case to it "for reconsideration in light of Reetz v. Bozanich . . . ." The District Court, exercising federal "pendent" jurisdiction, had held that an Iowa statute violated the Iowa Constitution because it had effected an "undue delegation of legislative power to an administrative agency." Dimery v. Department of Social Services of Iowa, 320 F.Supp. 1125,

1130 (1969). In this context, the action by the Supreme Court of the United States may be looked upon as consistent with the "special and unique" criterion expressly stated in Reetz v. Bozanich insofar as the federal Constitution refrains from dictating to the states that legislative power shall not be vested in, or exercised by, branches of government (or the agencies included in them) other than the legislative. Thus, as affecting any state government, the prohibition against undue delegation of legislative power derives specially and uniquely from that State's own Constitution.

on diminishing its significance. In Fornaris v. Ridge Tool Co., 400 U.S. 41, 91 S. Ct. 156, 27 L.Ed.2d 174 (1970) the Court described *Reetz* as holding that

"a three-judge federal court should not have proceeded to strike down an Alaska law which, *if construed by the Alaska Supreme Court, might be so confined as not to have any constitutional infirmity.*" (p. 43 of 400 U.S., p. 157 of 91 S.Ct.)

In this vein, Reetz v. Bozanich would be not a new exposition of principle but merely another application of a long established "paradigm" for federal abstention. See: Kusper v. Pontikes, supra (also, see ante, n. 10, at pp. 674–675).

The *Fornaris* approach to Reetz v. Bozanich was repeated by the Court majority in Wisconsin v. Constantineau, supra, to distinguish *Reetz* on the ground that the Wisconsin statute was clear and incapable of a narrowing State Court construction—thus to support the decision in Wisconsin v. Constantineau that abstention was not there justified. On this basis, the majority in Wisconsin v. Constantineau became exposed to the telling criticism of Mr. Chief Justice Burger in his dissenting opinion that (1)

"It is no answer to contend that there is no ambiguity in the Wisconsin statute and hence no need to abstain; in *Reetz* the Alaska statute could not have been more plain, or less susceptible of a limiting construction" (p. 442 of 400 U.S., p. 512 of 91 S.Ct.)

and (2)

"*Reetz* cannot be distinguished and I see no reason to depart from the principles it reaffirmed." (p. 442 of 400 U.S., p. 513 of 91 S.Ct.)

Yet, by the clear and express language used throughout the opinion in Reetz v. Bozanich, as well as the relationship of the language to the facts, there was a meaningful substantive distinction between Reetz v. Bozanich and Wisconsin v. Constantineau—a distinction which, for some reason which escapes us, the majority in Wisconsin v. Constantineau chose to ignore.

It had never been mentioned in Reetz v. Bozanich that the Alaska *statute* was ambiguous or susceptible of a limiting interpretation of its meaning. The language of the opinion referred only to nullification of the statute by force of the Alaska Constitution. Thus, the opinion variously stated:

(1) " . . . the provisions of the *Alaska Constitution* at issue have never been interpreted by an Alaska court." (p. 86 of 397 U.S., p. 790 of 90 S.Ct.)

(2) " . . . here the nub of the whole controversy may be the *state constitution.*" (p. 87 of 397 U.S., p. 790 of 90 S.Ct.)

(3) " . . . we have concluded that *the first judicial application of these constitutional provisions* should properly be by an Alaska court." (p. 87 of 397 U.S., p. 790 of 90 S. Ct.)

(4) "We think the federal court should have stayed its hand while the parties repaired to the state courts for a resolution of their *state constitutional* questions." (p. 87 of 397 U. S., p. 790 of 90 S.Ct.) (all emphases supplied)

Moreover, factually, Reetz v. Bozanich involved provisions of the Alaska Constitution having a special content concerned with fish as a natural resource unique to Alaska. Hence, the Alaska Constitution would test the validity of the Alaska statute in respects essentially different from the invoked "equal protection of the laws" clause of the Fourteenth Amendment to the federal Constitution. By contrast, in Wisconsin v. Constantineau the applicable provision of the Wisconsin Constitution was a substantive counterpart of the applicable federal constitutional provision. As

stated by Mr. Chief Justice Burger in his dissenting opinion:

"Although Wisconsin has no due process clause as such, Art. I, § 1, of the Wisconsin Constitution has been held by the Wisconsin Supreme Court to be substantially equivalent to the limitation on state action contained in the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Pauly v. Keebler, 175 Wis. 428, 185 N.W. 554 (1921)." (n. 1, at p. 440 of 400 U.S., at p. 511 of 91 S.Ct.)

Thus, in Wisconsin v. Constantineau, even though it was the State Constitution which was generating them, the overtones of ultimately governing impact would have a timbre more federal than State.

Had the majority opinion in *Constantineau* seen fit explicitly to distinguish Reetz v. Bozanich on this rationale not only would it have been on more solid ground within its own confines (and not exposed to the attack levelled against it by Mr. Chief Justice Burger in dissent) but also it would have confirmed, rather than undermined, the vitality of the new principle explicitly formulated in *Reetz*.

Chief Judge (of the United States Court of Appeals for the Second Circuit) Henry J. Friendly apparently is willing to cut through the language cloud in which Fornaris v. Ridge and Wisconsin v. Constantineau have enveloped Reetz v. Bozanich and reach the real substantive difference between them. Judge Friendly says:

"Abstention is . . . justified when a state statute is subject to fair challenge under state constitutional provisions having no counterpart in the Federal Constitution [Reetz v. Bozanich]. Here . . . abstention may save the federal courts from a needless task and unnecessary confrontation with a state. On the other hand, a divided Court has held abstention to be improper where the state statute was clear and the state constitutional attack would be on the same basis as the federal [Wisconsin v. Constantineau]." Henry J. Friendly, Federal Jurisdiction: A General View (1973) (p. 93)

Judge Friendly states further that he sees Askew v. Hargrave, 401 U.S. 476, 91 S. Ct. 856, 28 L.Ed.2d 196 (1971) as confirming the distinction. Ibid, p. 93, n. 81. It seems open to question, however, that this is correct. In Askew v. Hargrave, by the time of oral argument, the Supreme Court of the United States had become aware of a case filed (subsequently to Askew v. Hargrave) in the Circuit Court of the Second Judicial Circuit of Leon County, Florida. The Supreme Court described this case as making an attack upon the Florida statute involved in Askew v. Hargrave

"primarily on state law grounds, as violative of provisions of the Florida Constitution." (pp. 477, 478 of 401 U.S., p. 857 of 91 S.Ct.)

For this reason, the Supreme Court remanded Askew v. Hargrave to the District Court with the comment:

"[The] state law claims under the Florida Constitution, . . ., if sustained, will obviate the necessity of determining the Fourteenth Amendment question. In such case, the line of decisions of which Reetz v. Bozanich, . . ., is a recent example, states the principles that should inform the exercise of . . . discretion as to whether to abstain." (p. 478 of 401 U.S., p. 858 of 91 S.Ct.)

This approach of the Supreme Court still leaves doubts as to the true import of Reetz v. Bozanich taken in conjunction with Wisconsin v. Constantineau. The *Askew* opinion itself gives no enlightenment on whether the provisions of the Florida Constitution involved in the subsequent Florida case were parallels of the "equal protection" clause of the federal Fourteenth Amendment being invoked in Askew v. Hargrave or embodied a special content causing them to be applicable in a manner uniquely different from the Fourteenth Amendment "equal protection" clause.

Further, some of the language in the *Askew* opinion suggests that the distinction is of no consequence. There is intimation, by the manner in which reference is made to Wisconsin v. Constantineau, that a United States District Court convened as a three-judge Court—thus to create potential for a "short-cut" direct appeal to the Supreme Court of the United States—should abstain (as per the dissent of Mr. Chief Justice Burger in Wisconsin v. Constantineau) if it discerns *any* "claim" under the State Constitution which may obviate the necessity of a decision under the federal Constitution. This tends to be supported by (1) the Askew v. Hargrave focus upon the technical and nominalistic point that the "claim" under the State Constitution is "not the 'same claim'" (p. 478, 91 S.Ct. 856) as the "claim" under the federal Constitution and (2) the Court's lack of interest in whether, should the state constitutional provision be a counterpart of the federal constitutional provision, the State constitutional attack would be essentially on the same basis as the federal.[16]

Notwithstanding the uncertainties in the recent decisions of the Supreme Court of the United States concerning federal abstention—as well as the intimation of Judge Friendly that it is of "dubious tenability" to establish a distinction predicated upon whether or not the state constitutional provision is a counterpart of the federal constitutional provision (see: Friendly, Federal Jurisdiction: A General View (1973), p. 93),—we find in the language, analysis, and enunciated principles of Reetz v. Bozanich an excellent charter to guide *our implementation of certification* as a state-proffered instrumentality, operative bilaterally, for the resolution of difficulties arising under our system of federalism and the enhancement of harmonious relations between the federal and state judiciaries.

Reetz v. Bozanich is a remarkable teaching model revealing (1) the nature of the tensions incident to our system of federalism (2) the deficiency of federal techniques unilaterally operative—abstention and the enlargement of "pendent" federal jurisdiction for the decision of questions of state law—to resolve the tensions while yet avoiding inequities to the litigants, and (3) the superiority in these respects of certification because it affords opportunity for the coordinated bilateral interaction of state and federal courts.

It was of the utmost importance to plaintiffs in Reetz v. Bozanich to have a speedy determination of their claims. Plaintiffs were striving to overturn Alaska administrative action, authorized by an Alaska statute and the regulations promulgated under it, which denied plaintiffs commercial salmon net gear licenses for the approaching 1969 fishing season. Plaintiffs could salvage the economic benefits of the 1969 fishing season if a court would respond quickly to invalidate the governing statute.

Plaintiffs concluded that they could predicate their attack on both the Alaska and federal Constitutions. The Alaska Constitution dealt specially with fish which, by their abundance in Alaska waters, are a unique natural resource of the State of Alaska. The Constitution of the United States had bearing in a fundamentally different manner by virtue of the applicability of "the equal protection of the laws" clause of the Fourteenth Amendment as binding upon the states.

In *Reetz* plaintiffs elected to initiate a single action in the federal judicial system.

16. Concurring in Rosado v. Wyman, supra, Mr. Justice Douglas made clear that the appropriateness of the exercise of a federal Court's "pendent" jurisdiction is heavily influenced by the relationship between the substance of the claim and federal policy. He said: " . . . it is clear from the opinion in *Gibbs* that the factor of federal-state comity is highly relevant in deciding whether or not the exercise of pendent jurisdiction is proper. Thus the Court stated: 'There may . . . be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong.'" (p. 425 of 397 U.S., p. 1224 of 90 S.Ct.)

They sought an injunction against the enforcement of the Alaska statute, and the regulations promulgated thereunder, on the substantial federal ground that they contravened the "equal protection" clause of the Fourteenth Amendment to the Constitution of the United States. In addition, plaintiffs invoked the United States District Court's "pendent" jurisdiction to decide the state law questions precipitated by the provisions of the Alaska Constitution dealing specially with fish as a unique natural resource of the State of Alaska.

The United States District Court, convened as a three-judge Court, fulfilled all of the expectations of plaintiffs. It gave plaintiffs a speedy decision, as of February 1969, which afforded them injunctive relief and thus salvaged for them the economic benefits of the 1969 fishing season; and the federal Court's decision was based not only on the "equal protection of the laws" clause of the federal Fourteenth Amendment but also on the special provisions of the Alaska Constitution having applicability to fish as a unique natural resource of Alaska.

Having won so much, plaintiffs were nevertheless later to find themselves without an ultimate definitive solution to their continuing status as fishermen in Alaska waters. In February of 1970, the Supreme Court of the United States vacated the judgment of the three-judge District Court and remanded the case, informing the plaintiffs and the United States District Court that

"  .   .   .  the federal court should have stayed its hand while the parties repaired to the state courts for a resolution of their state constitutional questions." (p. 87 of 397 U.S., p. 790 of 90 S.Ct.)

In reaching this conclusion, the Supreme Court of the United States took account of the nature of our system of federalism and of federal-state tensions incident to it (which are accentuated by the enlarged authority of federal courts to decide state law questions under federal court "pen-

dent" jurisdiction). Having available to it in the Reetz v. Bozanich situation only unilaterally operative federal techniques to ameliorate such tensions, the Supreme Court of the United States in effect promulgated a mandate that "abstention" must have primacy over the enlarged federal "pendent" jurisdiction for the decision of state law issues—as these are federal unilaterally operative practices to maintain a sound federalism and promote federal-state comity—and notwithstanding that such approach will often involve, as in Reetz v. Bozanich itself, serious detriment to the litigants.

At this juncture, the superiority of "certification" (were it available in Reetz v. Bozanich) as an instrumentality allowing bilateral cooperative participation by the federal and state judicial systems becomes apparent.

By use of certification in Reetz v. Bozanich the "system" interests—of a sound federalism and state-federal comity—would be furthered insofar as (1) the State Court of last resort would pronounce the truly definitive answers to the state questions of law arising under the State Constitution and which, because they involve provisions of the State Constitution having a content specially and uniquely different from the potentially applicable federal constitutional provisions, are exclusively State-oriented; (2) by certifying the questions of state law, the federal judiciary would fulfill its own internal policy to avoid decision of federal constitutional claims if an independent state ground of decision will render such decision unnecessary, and (3) should the state court's answer to the certified questions of state law fail to obviate the necessity of a decision of the federal constitutional issues, it would be the federal judiciary which, appropriately, would decide such federal issues. The only costs, system-wise, reasonably discernible in the certification process would be a potential impairment of the legitimate concern of the state judiciary that on state constitutional issues having an exclusively state

cast it is preferable to have state court fact-finding and a refining of the issues through the state court system to ensure that the state judiciary will fulfill its own internal policy that state constitutional questions shall not be decided unless strictly necessary.

In the Reetz v. Bozanich pattern of cases, certification clearly benefits the litigants by ameliorating the burdens to them caused by the Supreme Court's mandate of federal abstention.

In a negative sense, certification spares the litigants the substantial delays resulting when the federal Court abstains because litigation must be commenced anew at the lower levels of the state judicial system and proceed to the Court of last resort for a final and definitive decision of the state law issues. More affirmatively, certification is likely to provide the litigants with a decision of the highest court of the State, as a definitive determination of the state law issues, almost as speedily as they would have the federal Court's (non-definitive) decision of them (if the federal Court does not abstain). Further, the extra costs to the litigants in money, energy, time and general inconvenience are likely to be far less in the certification process than in the prosecution of an independent state action to be carried through the trial and appellate levels of the state judicial system (the result produced by federal abstention).

■ Finally, in the Reetz v. Bozanich class of cases, certification substantially fulfills an important objective of the United Mine Workers v. Gibbs enlargement of the "pendent" jurisdiction of the federal courts to decide questions of state law which tends to be frustrated by the Reetz v. Bozanich command that the benefits to the litigant flowing from the exercise of federal "pendent" jurisdiction must yield to the "system" values achieved by federal abstention. Over and above a generalized policy concern to avoid piece-meal litigation, it was a purpose of the expansion of

federal "pendent" jurisdiction to decide state law issues that the federal Courts be placed substantially on a par with State Courts as to the power to dispose of all the claims, whether federal or state, involved in a single litigational matrix. This minimizes the risk that a litigant anxious that all his claims, state and federal, should be settled in a single lawsuit may forego his federal forum to submit both his federal and state claims for decision in one state court action.

With certification available the litigant is able to submit his federal claims for decision by the federal Court and still enjoy the benefit that both his federal and state claims will be settled in the substantial equivalent of a single lawsuit. It is likely that the litigant will look upon the federal Court's certification, to the State Court of last resort, of the state law questions involved as, essentially, an aspect of the underlying federal Court proceedings; and, to the extent that two courts become involved in fact, the litigant most probably will consider the costs of such duality (likely in any event to be minimal) as, on balance, a price worth paying for the enormous benefit of a reasonably speedy definitive determination of the state law questions.

■ We, therefore, now pronounce as the generalized policy of this Court (subject only to possible narrow exceptions for individual situations which may involve a serious invasion of legitimate interests which this Court has responsibility to protect) that when there is involved in a cause pending before a federal Court a question whether a Maine statute violates the Constitution of Maine—and also: (1) the federal Court considers such question to lie within its "pendent" jurisdiction to decide, (2) the provisions of the Maine Constitution affect the validity of the statute in respects specially and uniquely different from provisions of the federal Constitution invoked to invalidate the statute, and (3) one alternative answer to the question, if it be the answer given by this

Court, will produce a final disposition of the federal proceeding in which federal decision of the federal constitutional issue is avoided,—the federal Court's resort to certification to achieve this Court's answer to such question of state constitutional law will receive from this Court a liberal and plenary implementation.

We envision that this approach to certification will frequently require this Court to make decisions on state constitutional issues which, not having originated in the state judicial system, will not have been subject to a full State Court development, refinement and fact-finding likely to be more attuned than similar federal processes to the State judiciary's own internal policy of avoiding unnecessary decision of state constitutional issues. We believe such potential sacrifice of state judicial interests will be minimal in the large majority of cases, (although there may be individual instances in which it may be too acute to be ignored) and is a contribution which this Court should gladly make, to achieve, with minimal prejudice to litigants, the "system" values of a sound federalism and the amelioration of state-federal irritations.

In the instant situation, the questions certified are confined to sections of the Maine Constitution affecting the validity of 21 M.R.S.A. § 1(1) in manner specially and uniquely different from the impact of the "equal protection of the laws" and "due process" clauses of the federal Fourteenth Amendment as binding on the States. The federal Court has wisely refrained from certifying to us questions under the parallel "equal protection of the laws" and "due process" clauses contained in Article I, Section 6–A of the Constitution of Maine (or of any other provisions of the Constitution of Maine which may be parallels of other federal constitutional provisions here involved). Thus, the instant certification has been kept within the narrow framework expressly described in Reetz v. Bozanich. We are not, therefore, here concerned with the other kinds of problems which would be involved were the federal Court to certify to us questions concerning provisions of the Constitution of Maine which are parallel in content to applicable provisions of the Constitution of the United States,—for the purpose of achieving objectives discussed, for example, in the dissent of Mr. Chief Justice Burger in Wisconsin v. Constantineau, supra.[17]

For the variety of reasons contained in the entirety of the foregoing exposition, we conclude that we have responsibility, and we are pleased, to answer the two questions concerning the Constitution of the State of Maine here certified to us by the United States District Court, District of Maine, convened as a three-Judge Court.

*3.*

■ We answer in the negative to the first certified question:

"... Is 21 M.R.S.A. § 1(1) inconsistent with Article II, § 1 of the Constitution of the State of Maine?"

17. Hence, our decision to look with favor upon the instant certification should not be interpreted to carry an intimation as to our approach to a situation in which the federal Court would certify questions concerning the validity of a Maine statute under provisions of the Constitution of Maine which are *parallels* of provisions of the federal Constitution also applicable to invalidate the statute. As we have already discussed, (ante at pp. 679–680), such parallel provisions of the Maine Constitution will tend to derive their essential content from the federal Constitution. Hence, this Court's approach to such provisions of the Maine Constitution will be mostly federally oriented. If the Supreme Court of the United States were ultimately to resolve the present uncertainties in its approach to federal abstention in this context by a decision that the federal Court must abstain, it may well be—although we do not now so decide—that the legitimate interests of our State judicial system would be better served if the use of certification were held inappropriate and the litigants required to develop their state constitutional claims "from scratch" in the State judicial system—thus to allow full opportunity to the state judiciary, by appropriate fact-finding and sifting of the issues, to ensure that it will make no unnecessary decision of a state constitutional question.

Plaintiffs maintain that the effect of 21 M.R.S.A. § 1(1) is to establish an "elector" qualification additional to the qualifications specified in Article II, Section 1 of the Constitution of Maine; and, hence, since that constitutional provision is the exclusively exhaustive delineation of the qualifications of "electors", it is violated by the statute.

In support of this position plaintiffs assert that in 1921 a broad and detailed "absentee ballot" statute was enacted (P.L. 1921, Chapter 38, later codified as R.S. (1930), Chapter 9, Section 1 et seq.). Under this statute, and until 1933 when the definitional exclusion in 21 M.R.S.A. § 1(1) became law, persons confined in jails or penal institutions were not denied the availability of the absentee ballot. Thus, plaintiffs argue, the real effect of the definitional exclusion in 21 M.R.S.A. § 1(1)— insofar as it denies to a particular class of citizens the one practical device previously available to them by which they are effectively enabled to cast their votes—is to fix the criterion defining such class as an additional "elector" qualification. This conclusion is buttressed, plaintiffs claim, because the definitional exclusion of 21 M.R.S.A. § 1(1) is rested not merely on a citizen's being in a jail or penal institution but on his being there as one *"serving a sentence."* It, therefore, permits citizens who are in a jail or penal institution for any reason other than that they are "serving a sentence" to be enabled to vote as an absentee; and in this specific facet the statute takes on an aura, in practical terms, of prescribing as an "elector" qualification that a person who is in a jail or penal institution is eligible to vote *only if he has not been convicted of a crime* (as the cause of his commitment).

This argument of plaintiffs is unconvincing.

We emphasize that in the face of the definitional exclusion of 21 M.R.S.A. § 1(1) plaintiffs, even though they have been convicted of a crime, have been permitted to *register* as voters. Since, under 21 M. R.S.A. § 102, only those persons who are qualified as "electors" are entitled to register as voters, that plaintiffs have been afforded registration establishes that they are acknowledged, under the law of Maine, to have all of the qualifications necessary to "elector" status. It thus becomes clear that 21 M.R.S.A. § 1(1) does not have the effect of fixing a qualification for an "elector" in terms of whether a citizen has been convicted of a crime. Rather, its effect is that plaintiffs, by being denied the benefit of absentee voting, must be present at the established polls in order to cast their votes.

That this is correct becomes discernible in most concrete terms when we observe that had plaintiffs reached such state of rehabilitation as would have entitled them to be outside the Prison "on furlough" during a period of time which included the day of election, plaintiffs, notwithstanding that they were "serving a sentence in a jail or penal institution", would not only have been qualified to vote but would have been able to cast their ballots by being present at the polls established in their municipality of residence.

Thus, 21 M.R.S.A. § 1(1) does not add to the *qualifications* of "electors" but, by denying to a class of citizens the benefits of absentee voting, requires them, if they wish to cast votes, to be present at the place officially fixed for holding the polls. It may well be that in the special circumstances of plaintiffs, subjecting them to a requirement that they may cast votes only by being present at the established polls is a condition impossible of attainment and thus effectively prevents them from voting. On this basis, the definitional exclusion of 21 M.R.S.A. § 1(1) may be invalid as an invidious discrimination against plaintiffs in violation of the "equal protection of the laws" clause of Article I, Section 6-A of the Constitution of Maine. That issue, however, is not the one under present evaluation, and it has not been certified to us by the federal Court as a question which

we should answer. We shall, therefore, refrain from volunteering, when it is not required of us, our opinion concerning that constitutional issue. For the purposes of the question now before us, we conclude that the only effect of 21 M.R.S.A. § 1(1) is to require plaintiffs to be present at the polls established by law in order to cast their votes. This does not impose upon plaintiffs an extra qualification to be an "elector" in violation of Article II, Section 1 of the Constitution of Maine. As stated in Cooley, Constitutional Limitations (8th Ed. 1927):

> "[I]t would not be seriously contended that a statute which should require all . . . citizens [qualified as electors] to go to the established place for holding the polls, and there deposit their ballots, and not elsewhere, was a violation of the Constitution, because prescribing an *additional qualification, namely, the presence of the elector at the polls.*" (p. 1369) (emphasis supplied)

### 4.

To the second certified question:

". . . Is 21 M.R.S.A. § 1(1) inconsistent with Article II, § 4 of the Constitution of the State of Maine?",

we answer in the negative.

To allow the reader more easily to follow the present analysis we repeat the text of Article II, Section 4:

> ". . . The Legislature under proper enactment shall authorize and provide for voting by citizens of the State absent therefrom in the Armed Forces of the United States or of this State and for voting by other citizens absent or physically incapacitated for reasons deemed sufficient."

This language, plaintiffs contend, denies to the Legislature any judgmental discretion to decide, as the Legislature deems appropriate, the circumstances in which the convenience of voting by absentee ballot shall be afforded to citizens.

The theory of plaintiffs is that the language, "for reasons deemed sufficient", as contained in the second of the two major segments which are conjunctively embodied in Article II, Section 4, modifies only the concept, "physically incapacitated"; and, therefore, the other concept of "absence" mentioned in the second segment must be read strictly in parallel with the mandatory, non-discretionary approach to the concept of "absence" designated in the first part of Article II, Section 4.

The claim must be rejected.

First, here, plaintiffs are not absent from the *State* but only from their municipality of residence. To benefit from their argument, then, plaintiffs must assume that even though the first part of Article II, Section 4 is concerned expressly only with absence from the *State,* the asserted parallelism between "absence" as mentioned in the first segment and "absence" as mentioned in the second segment somehow achieves, without the existence of any language to cause it, an enlargement of the concept of absence in the second segment to include a citizen's absence not only from the State but also from his municipality of residence. The validity of such hypothesis is open to serious question; and this, in itself, would render the argument of plaintiffs—as claiming an absolute mandatoriness concerning legislative action relative to "absence" in the second portion of Article II, Section 4—highly suspect.

In any event, and without deciding the point, even if we accept this hypothesis of plaintiffs, arguendo, we conclude that the words, "for reasons deemed sufficient", appearing in the second segment of Article II, Section 4 are applicable not only to "voting by . . . citizens . . . physically incapacitated" but also to "voting by citizens . . . absent."

It may be acknowledged that insofar as Article II, Section 4 commences with the

overall command that "[t]he Legislature under proper enactment shall authorize and provide . . .", there is an element of mandatoriness involved. As to the first segment, it is reasonable to conclude that the mandate takes the form of requiring the Legislature to provide the convenience of absentee voting to those citizens who are therein plainly and explicitly described by the Constitution itself *with a totality of detail*—namely, those citizens who are (1) absent from the *State,* and (2) the reason for whose absence is that they are "in the Armed Forces of the United States or of this State . . . ."

As to absence in the second segment of Article II, Section 4, and on the present hypothesis that absence as there used includes a citizen's absence not only from the State but also from the municipality of his residence, the constitutional provision itself says *nothing* as to particular reasons for the absence (the second segment in this respect being in marked contrast to the first portion). Thus, the alternatives of interpretation are that (1) this portion of Article II, Section 4 was calculated to prescribe a totally absolute guarantee of absentee voting, whether the citizen is absent from the State or from his municipality of residence, *no matter what the reason for the absence*; or (2) that it was the constitutional intention that the Legislature "under proper enactment" shall, as the Legislature deems appropriate, prescribe the reasons for absence which (over and above the single reason constitutionally fixed in the first portion of Article II, Section 4) are to entitle citizens to the benefits of absentee voting.

We are satisfied that the total language structure of Article II, Section 4 makes this second alternative a more plausible interpretation—in that (1) the Legislature is instructed to make "proper enactment" and (2) in the distinctly separate second segment of the Section in which the phrase "for reasons deemed sufficient" appears, the concept of absence (as likewise appearing in said second segment) although separated from the phrase, "for reasons deemed sufficient", has reasonable syntactical relationship to it.

Furthermore, this interpretation is more realistic, policywise. In light of the almost inexhaustible variety of circumstances which could constitute reasons for citizens to be absent not only from the State but, within the State, from their municipalities on election day, and so many of which could be highly trivial and involve nothing more than the most minor inconvenience in keeping the citizen from the official polls, it seems far-fetched to believe that the people of Maine could have intended to make a constitutional mandate, calculated to be operative long-range, that, in absolute terms, and no matter what the reason for a citizen's absence, the convenience of absentee voting shall be established for the benefit of any citizen who is "absent."

Thus, the only mandatory feature attached to the second segment of Article II, Section 4 is the constitutional command that the Legislature prescribe *at least some reasons*, other than a citizen's being "in the Armed Forces of the United States or of this State . . . .", on the basis of which citizens will be allowed the benefits of absentee voting. Exactly what those reasons are to be, however, the Constitution leaves to the Legislature to specify "under proper enactment" as the Legislature, according to its judgmental discretion, may decide.

It is clear that the Maine Legislature has, by enacting 21 M.R.S.A. § 1(1), fulfilled the command of Article II, Section 4, that by proper enactment it shall prescribe *some* reasons it deems sufficient for voting by citizens who are "absent" from the State or from their respective municipalities of residence. That, in its evaluation of the variety of ramifications in the range of details by which the authorization of absentee voting is to be made operative, the Legislature has concluded that "serving a sentence in a jail or penal institution", as a reason for a citizen's "absence" from the municipality during the time the polls are

open on election day, is an insufficient reason to afford the citizen the benefit of absentee voting does not, therefore, produce a transgression of Article II, Section 4 of the Constitution of Maine.[18]

The Clerk will transmit these instructions to the District Court of the United States, District of Maine, convened as a three-Judge Court pursuant to 28 U.S.C. § 2281.

So ordered.

All Justices concurring.

18. Whether such judgment by the Legislature contravenes "equal protection of the laws" constitutional guarantees, we repeat, is not presently under discussion and is a question which the federal Court has not certified to us for our answer. We, therefore, offer no opinion on that question since it is here unnecessary for us to decide it.