MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions

Decision:    2022 ME 12
Docket:      Fed-20-306
Argued:      September 8, 2021
Decided:     February 10, 2022

Panel:       STANFILL, C.J., and MEAD, JABAR, HUMPHREY, HORTON, and CONNORS, JJ., and HJELM,
             A.R.J.
Majority:    STANFILL, C.J., and MEAD, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.
Dissent:     HJELM, A.R.J.

THOMAS FRANCHINI

v.

INVESTOR'S BUSINESS DAILY, INC., et al.

JABAR, J.

[¶1]  In this case, we address the First Circuit Court of Appeals' order certifying a question of law to us: "Should [Investor Business Daily's] special motion to dismiss be granted under Me. Rev. Stat. tit. 14, § 556 (Maine's anti-SLAPP law)?"  Because there is clear controlling precedent, we decline to consider the question.

## I. BACKGROUND

### A.    Facts

[¶2]  The facts, as recited here, are taken from the First Circuit order. *Franchini v. Inv.'s Bus. Daily*, 981 F.3d 1 (1st Cir. 2020.)  In the 1990s, Investor's Business Daily (IBD) launched a National Issues feature with the set goal of "not

2

merely criticizing policies and programs, but also, where possible, putting forward reasonable solutions or policy responses" on "political, regulatory, economic and health care issues" to influence public policy reform at the federal government. This feature started as an editorial page where IBD invited "a well-regarded core of writers, thinkers and policy makers to take part in [the] 'IBD Brain Trust'" and later "expand[ed] to include op-eds submitted from outside contributors."

[¶3]  Sally Pipes has written "regularly for IBD on health care since the late 1990s," and is the president and chief executive officer of the Pacific Research Institute, "whose mission is to advance free market-policy solutions to current governmental public policy issues." Pipes is not an employee of IBD.[1] On December 22, 2017, IBD published an op-ed entitled "Sally C. Pipes: VA Negligence Is Killing Veterans"; the byline named Pipes as the op-ed's author. The op-ed is a general critique of the Department of Veterans Affairs.[2]

---

[1]  It is not clear from the record whether Sally Pipes was a member of the "IBD Brain Trust" or if she was an outside contributor who submitted op-eds. The December 22, 2017, op-ed states that she is a columnist. The First Circuit stated that the district court did not "make any adverse finding of fact relating to IBD's uncontested declaration that the Sally Pipes Op-Ed was part of an editorial effort to 'favorably affect[] public policy.'"

[2] It is not clear how to categorize this piece. The district court referred to it as an article. However, the First Circuit and the declarations refer to it as an op-ed. The published piece stated only that Sally Pipes is a columnist. This opinion will follow the language of the First Circuit and will refer to the piece as an op-ed.

[¶4]  The only direct reference to Thomas Franchini was midway through the op-ed:

> Consider the case of Thomas Franchini, a podiatrist at a Maine VA hospital.  Franchini botched 88 procedures.  He severed a patient's tendon during one surgery and failed to successfully fuse one woman's ankle in another.  The latter's leg had to be amputated as a result.  Franchini wasn't fired for any of these errors.  Instead, the VA allowed him to resign and return to private practice.

The op-ed ended, "The VA is in shambles.  Absent reform that allows vets to seek care in the private sector, our veterans will continue to be subjected to subpar care."  Pipes stated that she intended this op-ed to be a "call to action . . . to enlist public participation in the health care policy issues under consideration by national and local governmental bodies."

[¶5]  The op-ed also included an embedded banner reading, "No Hidden Agenda: Get News From a Pro-Free Market, Pro-Growth Perspective."  The end of the op-ed included a biography of Pipes and a hyperlink that stated, "Click here for more Commentary and Opinion from Investor's Business Daily."

**B.    Procedure**

[¶6]  On February 5, 2018, Franchini filed a complaint in the United States District Court for the District of Maine against multiple defendants, including Pipes and IBD.  Franchini brought multiple counts against the parties, including defamation and negligent infliction of emotional distress against IBD, and

4

requested a jury trial. IBD and the other defendants, except for Pipes, moved to dismiss for failure to state a claim.[3]

[¶7] IBD separately filed a special motion to dismiss arguing that either Maine's or California's anti-SLAPP statute applied.[4] It included declarations of Pipes and Chris Gessel, the chief content officer of IBD.[5] Pipes's declaration included two exhibits: the op-ed as published and the op-ed with footnotes to sources of the facts.

[¶8] On March 28, 2019, the district court (*Singal, J.*) denied the special motion to dismiss pursuant to the Maine anti-SLAPP statute and declined to determine whether the California anti-SLAPP statute applied.

---

[3] The case against Pipes was ultimately dismissed because Franchini failed to timely serve process on her.

[4] SLAPP stands for Strategic Lawsuits Against Public Participation, which are lawsuits that are filed with the goal of "stop[ping] citizens from exercising their political rights or to punish them for having done so." George W. Pring, *SLAPPs: Strategic Lawsuits Against Public Participation*, 7 Pace Env't L. Rev. 3, 4-6 (1989). To prevent this infringement on the defendants' constitutional rights, states have passed anti-SLAPP statutes primarily to address citizen objections to matters of public concern. *See Morse Brothers., Inc. v. Webster*, 2001 ME 70, ¶ 10, 772 A.2d 842.

[5] Under Maine's anti-SLAPP statute, 14 M.R.S. § 556, courts are to "consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based." 14 M.R.S. § 556 (2021). Although the motion was not accompanied by any "affidavits," both declarations that the district court considered were made pursuant to 28 U.S.C. § 1746, which allows for "any matter required or permitted to be supported, evidenced, established or proved by . . . affidavit" to be made in writing under penalty of perjury. 28 U.S.C.S. § 1746 (LEXIS through Pub. L. 117-80, approved Dec. 27, 2021). Thus, the declarations filed with the federal court are equivalent to affidavits filed in Maine courts.

[¶9]  IBD timely appealed the denial of the special motion to dismiss.  On November 13, 2020, the First Circuit issued a written order certifying an underlying question of law to us.  In the order, the First Circuit stated that the district court did not address IBD's argument that it was engaged in petitioning activity on its own behalf, which is an issue that "the *Gaudette* footnote expressly reserved."  *See Gaudette v. Mainely Media, LLC (Gaudette II)*, 2017 ME 87, ¶ 18 n.3, 160 A.3d 539.

[¶10]  The First Circuit certified one question to us: "Should IBD's special motion to dismiss be granted under Me. Rev. Stat. tit. 14, § 556 (Maine's anti-SLAPP law)?"  The First Circuit also "welcome[d] any further comments the Law Court may have on relevant Maine Law."

## II.  DISCUSSION

[¶11]  Before answering the question certified to us by the First Circuit, we must first decide whether to consider the certified question.

[¶12]  Although authorized by 4 M.R.S. § 57 (2021), our consideration of certified questions of law is discretionary.  *See* M.R. App. P. 25; *Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, ¶¶ 7-8, 157 A.3d 223; *Doherty v. Merck & Co.*, 2017 ME 19, ¶ 8, 154 A.3d 1202; *Fortin v. Titcomb*, 2013 ME 14, ¶ 3, 60 A.3d 765.  We have said that we

6

> may consider the merits of a certified question when three criteria are met: (1) there is no dispute as to the material facts at issue; (2) there is no clear controlling precedent; and (3) our answer, in at least one alternative, would be determinative of the case.

*Scamman*, 2017 ME 41, ¶ 7, 157 A.3d 223 (quotation marks omitted).

[¶13] Although the certified question is framed in terms of whether a pending motion should be granted rather than in terms of a question of law (and we could decline to answer on that ground), we infer that the question of law presented is the one that the First Circuit described as being left open in the district court decision—whether a publication must show that it was petitioning on its own behalf to invoke the protection of Maine's anti-SLAPP statute. The statute, 14 M.R.S. § 556 (2021), allows for a party to bring a special motion to dismiss only if the claim against it is based on petitioning activity. We have adopted a burden-shifting framework to determine if a special motion to dismiss should be granted. *Thurlow v. Nelson*, 2021 ME 58, ¶¶ 12, 19, 263 A.3d 494. The legal issue in this case involves the first step of our anti-SLAPP analysis. Under this first step, we have stated, "the defendant must file a special motion to dismiss and establish, based on the pleadings and affidavits, that 'the claims against [him] are based on [his] exercise of the right to petition pursuant

to the federal or state constitutions.'"[6] *Gaudette v. Davis (Gaudette I)*, 2017 ME 86, ¶ 16, 160 A.3d 1190 (quoting *Morse Brothers, Inc. v. Webster*, 2001 ME 70, ¶ 19, 772 A.2d 842). When applied to newspapers, we have explained that "[u]nless a newspaper is petitioning *on its own behalf*, the newspaper is not exercising its own right of petition." *Gaudette II*, 2017 ME 87, ¶ 15, 160 A.3d 539 (emphasis added).

[¶14] In certifying this question of law for our review, the First Circuit stated that "the district court did not address [IBD's argument that it was petitioning on its own behalf] and the *Gaudette* [*II*] footnote expressly reserved [this argument]."[7]

---

[6] "A party's exercise of its right of petition" is defined in Maine's anti-SLAPP statute as

> any written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

14 M.R.S.A. § 556.

[7] The footnote states in full: "Because the news reports at issue in this appeal do not constitute petitioning activity, we need not speculate on when news reporting or editorializing might constitute petitioning activity." *See Gaudette v. Mainely Media, LLC (Gaudette II)*, 2017 ME 87, ¶ 18 n.3, 160 A.3d 539.

8

[¶15]  We have already decided that a party making a special motion to dismiss pursuant to the anti-SLAPP statute must show that the claim against it arises out of its exercise of its own right of petition.  In *Gaudette II*, we affirmed the trial court's dismissal of the special motion to dismiss because the anti-SLAPP statute did not apply to the publication of the articles at issue because "the newspaper was documenting current events, which included documenting others' exercise of their right to petition.  [The newspaper] itself may have had views on the alleged abuse and how government should respond to the alleged abuse, but those views were not communicated in the articles." *Id.* ¶¶ 15, 18.

[¶16]  Although we reserved commentary in *Gaudette II* "on when news reporting or editorializing might constitute petitioning activity," *id.* ¶ 18 n.3, we also made it clear that the protection of the anti-SLAPP statute applies to newspaper publishers or other parties only when they are petitioning on their own behalf:

> Maine's anti-SLAPP statute is not applicable to newspaper articles unless [1] those articles constitute the newspaper petitioning on its own behalf or [2] the party seeking to invoke the anti-SLAPP statute is a party that used the newspaper to broadcast the party's own petitioning activities.

*Id.* ¶ 17.

[¶17]  The determination of whether and on whose behalf a publication or other party has engaged in petitioning activity is a case-specific, fact-driven inquiry.  *Gaudette I*, 2017 ME 86, ¶ 16, 160 A.3d 1190; *Nader v. Me. Democratic Party*, 2013 ME 51, ¶ 12 n.9, 66 A.3d 571.

[¶18]  After reviewing the facts, the district court specifically referenced *Gaudette II* in concluding that IBD was not engaged in petitioning activities "on its own behalf."  The dissent recognizes that "the [district court] and [the First Circuit] may be seen to view the parties' submissions filed in connection with the special motion to dismiss in ways that are not entirely consistent." Dissenting Opinion ¶ 29 n.12.  We agree with the dissent that it is not our role to second-guess either court's construction.  The point is that there are clear principles that a court can follow, laid out in *Gaudette II*, to conclude whether, depending on the interpretation of the facts, a publication is engaging in petitioning activity on its own behalf.  Whether the facts in this case constitute petitioning activity will not answer how the next case will be decided.

[¶19]  The dissent states that "if we were to conclude that IBD's publication of the Pipes column constituted petitioning activity by IBD, then IBD would be entitled to a favorable disposition of its motion, meaning that the claim itself would be dismissed in federal court."  Dissenting Opinion ¶ 42.

[¶20]  We should not make this determination.  The conclusion as to the fact-driven analysis surrounding petitioning activity must be left to the fact-finder.  Its conclusion will depend upon inferences that it draws from the stated facts.  It is up to the First Circuit, acting in an appellate capacity, to determine whether the inferences drawn by the district court that lead to its legal conclusion regarding petitioning activity are supported by the evidence.  It is not our function to make that determination in response to a certified question presented to us.

### III.  CONCLUSION

[¶21]  Because there is clear precedent that applies to the dispute, we decline to answer the certified question of law submitted to us by the First Circuit.

The entry is:

> Certified question of law returned to the First
> Circuit Court of Appeals without answer for the
> reasons stated in this opinion.

HJELM, A.R.J., dissenting.

[¶22] I respectfully dissent. Pursuant to well-established principles governing our treatment of certified questions, we should reach and address the merits of the state-law issue on which our colleagues on the Court of Appeals for the First Circuit seek our authoritative guidance. As the First Circuit has framed the issue, each of the predicate conditions establishing our authority to accept the case is satisfied here: there is no dispute of fact material to the legal issue presented; one of the answers we can provide will be determinative of the federal claim between the parties before us; and—contrary to the Court's conclusion—there is no clear controlling precedent in our jurisprudence that disposes of the issue. With those conditions being satisfied, we should exercise our discretion favorably and accept the question.

[¶23] I will first discuss the salient principles underlying the certification process generally and then address the specific jurisdictional element on which the Court erroneously rejects the First Circuit's tender of the case for our consideration.

A. Certification

[¶24] The availability of the process by which a federal court may refer—or certify—an unsettled question of state law to that state's highest court is

12

born of principles of federalism, comity, and efficiency. The notion of a federal court's certification of state-law questions, even when those questions arise in nonconstitutional diversity cases, has been articulated since at least the 1940s. *See Meredith v. Winter Haven*, 320 U.S. 228, 236 (1943). In 1965, the Maine Legislature codified the Supreme Judicial Court's jurisdiction to adjudicate questions certified by a federal court by amending the statute that defines, in part, the scope of our authority generally. P.L. 1965, ch. 158. Title 4 M.R.S. § 57 (2021) now states in pertinent respect,

> When it appears to the Supreme Court of the United States, or to any court of appeals or district court of the United States, that there is involved in any proceeding before it one or more questions of law of this State, which may be determinative of the cause, and there are no clear controlling precedents in the decisions of the Supreme Judicial Court, such federal court may certify any such questions of law of this State to the Supreme Judicial Court for instructions concerning such questions of state law, which certificate the Supreme Judicial Court sitting as the Law Court may, by written opinion, answer.

Then, in order to implement that statutory authority, we promulgated a series of procedural rules—former Maine Rule of Civil Procedure 76B (West 2000) and its successor, Maine Rule of Appellate Procedure 25, which is currently in effect—that prescribe the state court procedure when a federal court certifies a question of law to us.

[¶25]  The jurisdictional predicate establishing our authority to answer federally certified questions includes the three elements prescribed explicitly in section 57: the issue is one of law; our answer will be determinative of the federal action;[8] and there is an absence of "clear controlling precedents" already on the books.  To these statutory requirements, we have added a fourth condition—that there be no dispute of material fact affecting the certified question.[9]  *See, e.g.*, *Bankr. Est. of Everest v. Bank of Am., N.A.*, 2015 ME 19, ¶¶ 13, 15, 111 A.3d 655; *Dinan v. Alpha Networks, Inc.*, 2013 ME 22, ¶ 11, 60 A.3d 792.  Given this set of circumstances that must be present for us to answer a certified question, our answer will be, in effect, a declaratory judgment that has "the force of decided case law" because the answer becomes "determinative of the [federal] cause."  *See In re Richards*, 223 A.2d 827, 832-33 (Me. 1966) (quotation marks omitted).

---

[8]  In construing this statute, 4 M.R.S. § 57 (2021), we have interpreted it to mean that our answer to a certified question must be, in at least one alternative, dispositive of the federal claim.  *See, e.g.*, *Bankr. Est. of Everest v. Bank of Am., N.A.*, 2015 ME 19, ¶ 13, 111 A.3d 655; *White v. Edgar*, 320 A.2d 668, 675 (Me. 1974).

[9]  This common law requirement allows us to steer clear of the general prohibition against issuing advisory opinions, because if there were material factual disputes, any answer we might provide would less likely be determinative.  *See In re Richards*, 223 A.2d 827, 833 (Me. 1966); *see also N. River Ins. Co. v. Snyder*, 2002 ME 146, ¶ 7, 804 A.2d 399.  For the reasons I explain below, *see infra* ¶¶ 28-29 & n.12, the facts presented here are not in dispute.

[¶26]  Beyond our discussions of the specific jurisdictional elements attendant to a certified question, we have commended the salutary principles and objectives underlying certification because it advances "a most fundamental principle of 'our federalism'"—that a state's highest court is the ultimate authority in interpreting that state's laws.  *White v. Edgar*, 320 A.2d 668, 675 (Me. 1974).  As we have written, our willingness to address issues certified by the federal courts works to the "mutual benefit" of the two judicial systems and furthers our "harmonious relationships."  *Id.* at 674.  Accordingly,

> in the situation in which a decision of a question of State law is necessary to a decision of the federal merits of a cause pending in the federal [c]ourt, it is, and will continue, *a strong policy of this Court*, as conducive to a sound federalism and the promotion of harmonious relations between federal and State [c]ourts, to implement the certification process afforded by 4 M.R.S.[] § 57 *in the fullest scope* consistent with this Court's proper functioning.

*Id.* at 675-76 (emphases added); *see also Bankr. Est. of Everest*, 2015 ME 19, ¶ 14, 111 A.3d 655; *Dinan,* 2013 ME 22, ¶ 22, 60 A.3d 792 (stating that "it is our policy to promote comity between the federal and state courts" by answering proper certified questions); 3A Harvey & Merritt, *Maine Civil Practice* § A25:1 at 244 (3d, 2021-2022 ed. 2021) (characterizing our opinions as expressing a "warm sympathy" toward accepting certified questions).[10]  As is maintained in

---

[10]  Federal jurisprudence also shines a favorable light on certification.  The Supreme Court of the United States has observed that if a claim pursued in federal court may turn on an unresolved issue

the leading treatise on Maine's civil practice, "For the sake of good federal-state relations, it may be expected that the federal courts will reserve certification for the unusual, hard case of general importance, and at the same time the Law Court will answer all questions certified to it except only ones plainly not in proper posture for its consideration." 3A Harvey & Merritt, *Maine Civil Practice* § A25:1 at 248-49 (alteration, footnotes, and quotation marks omitted).

[¶27] Against this backdrop that demonstrates the generous view we take toward acceptance of certified questions, I turn to the question at issue here.

## B. Factual Background, *Gaudette II*, and the Certified Question

[¶28] The certification process binds us to the facts as determined by the certifying court, here, the First Circuit.[11] *See Johnson v. Allstate Ins. Co.*, 687 A.2d

---

of state law, resort to that state's court of last resort "does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism." *Lehman Brothers v. Schein*, 416 U.S. 386, 391 (1974); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997) (stating that certification "allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response"). The Court has also stated that "where . . . there is an efficient method for obtaining a ruling from the highest court of a State we do not hesitate to avail ourselves of it." *Elkins v. Moreno*, 435 U.S. 647, 662 n.16, 668 (1978).

[11] This principle is made even more clear by the procedure that is to be used if facts beyond those provided by the certifying court are needed to illuminate the certified question of law. In that situation, we are required to take certain affirmative steps in order to expand the record before us so that it may include additional parts of the record that had already been created before the federal court. M.R. App. P. 25(c); *see also* 3A Harvey & Merritt, *Maine Civil Practice* § A25:2 at 249 (3d, 2021-2022 ed. 2021).

642, 643 (Me. 1997) (describing the facts "as certified to this Court"); *Hiram Ricker & Sons v. Students Int'l Meditation Soc'y*, 342 A.2d 262, 263 (Me. 1975) (describing the facts "set out in the certificate"); M.R. App. P. 25(b) (providing that the federal court's certification shall contain, among other things, "a statement of facts showing the nature of the case and the circumstances out of which the question of law arises").

[¶29] The First Circuit has presented the following facts to us. Defendant Investor's Business Daily (IBD) is a subscription news service that pursues a mission both to criticize existing public policies and to propose solutions and policy responses. *Franchini v. Inv.'s Bus. Daily, Inc.*, 981 F.3d 1, 3 (1st Cir. 2020). Prominent among the topics addressed by IBD is health care. *Id.* On that issue, Sally Pipes is one of IBD's regular contributors. *Id.* In December of 2017, IBD published one of her submissions, which is central to this action. *Id.* The column criticized the medical care being provided to veterans by the Department of Veterans Affairs—an agency that Pipes described as being "infamous for administering low-quality care." *Id.* at 5. The column singled out plaintiff Thomas Franchini as having "botched" nearly ninety podiatric procedures at a VA hospital in Maine. *Id.* Pipes wrote the piece, which advocates for specific reforms, "to enlist public participation in order to

influence national health care policy." *Id.* at 4, 6, 9-10. IBD chose to publish the column because Pipes's views were "aligned with its own"—an alignment apparent in the piece itself—and as "part of an editorial effort to 'favorably affect public policy.'"[12] *Id.* at 6, 10 (alteration omitted).

[¶30] After IBD published the article, Franchini filed a defamation action in federal court against IBD and others. *Id.* at 6. In response, IBD moved for the court to dismiss the action pursuant to Maine's anti-SLAPP statute, 14 M.R.S. § 556 (2021).[13] *Franchini*, 981 F.3d at 6. The court denied IBD's motion based

---

[12] I recognize that, regarding this aspect of the record, the federal district and appellate courts may be seen to view the parties' submissions filed in connection with the special motion to dismiss in ways that are not entirely consistent. In particular, the district court's order stated that the column written by Pipes constituted "essentially a news report recounting recent failings at the VA and does not articulate any of IBD's views"—in other words, that neither the content of the column nor IBD's decision to publish it constituted IBD's own advocacy. *Franchini v. Bangor Publ'g Co.*, 383 F. Supp. 3d 50, 65 (D. Me. 2019). In contrast, as noted in the text, the First Circuit stated that IBD decided to publish Pipes's article, which contained advocacy, because her view "aligned with its own" and did so in an effort to influence public policy. *Franchini v. Inv.'s Bus. Daily, Inc.*, 981 F.3d 1, 9-10 (1st Cir. 2020). To the extent the two courts expressed disparate views of the facts, it is not our role to second-guess either construction. Rather, for the reasons set out above, *see supra* ¶ 28, we must accept the facts as articulated by the certifying court—the First Circuit. This eliminates any intercourt dispute of material fact, thereby satisfying that statutory aspect of our jurisdiction over the certified question. *See supra* ¶ 25.

[13] Title 14 M.R.S. § 556 (2021) states in pertinent part:

When a moving party asserts that the civil claims, counterclaims or cross claims against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of the United States or the Constitution of Maine, the moving party may bring a special motion to dismiss. The special motion may be advanced on the docket and receive priority over other cases when the court determines that the interests of justice so require. The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider

on its reading of our decision in *Gaudette v. Mainely Media, LLC* (*Gaudette II*), 2017 ME 87, 160 A.3d 539. *Franchini v. Bangor Publ'g Co.*, 383 F. Supp. 3d 50, 64-65 (D. Me. 2019).

[¶31]  The issue in *Gaudette II* was the applicability of section 556 to a defamation claim asserted against a newspaper based on its publication of a series of articles about allegations of criminal conduct committed by Gaudette and grand jury proceedings that did not produce criminal charges against him. 2017 ME 87, ¶¶ 1, 3-7, 160 A.3d 539.  In response to the complaint for defamation, the newspaper's owner, Mainely Media, filed a special motion to dismiss based on section 556. *Id.* ¶¶ 7-8.  The question generated by Mainely Media's motion was whether the published articles constituted the "exercise of the moving party's right of petition" within the meaning of the anti-SLAPP

---

the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

. . . .

As used in this section, "a party's exercise of its right of petition" means any written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

statute. *Id.* ¶ 17 (quotation marks omitted). The trial court denied the motion. *Id.* ¶ 8.

[¶32] On the resulting appeal, we held that publication of the articles in question did not amount to the exercise of the newspaper's right to petition because "the newspaper was documenting current events, which included documenting others' exercise of their right to petition," and because the articles did not convey any views the newspaper may have had on the reported matters. *Id.* ¶ 15. We also stated that "[u]nless a newspaper is petitioning on its own behalf, the newspaper is not exercising its own right of petition." *Id.* But in a footnote that later played a prominent part in the First Circuit's decision to certify the issue in this case to us, we expressed a limitation on the scope of our holding that Mainely Media had not exercised its right to petition when it published the "news report." In the footnote, we stated, "Because the news reports at issue in this appeal do not constitute petitioning activity, we need not speculate on when news reporting or editorializing might constitute petitioning activity." *Id.* ¶ 18 n.3.

[¶33] In Franchini's federal action, given the district court's reading of the record that the Pipes column contained mere news reporting, *but see supra* n.12, the court determined that IBD had not engaged in petitioning

activity when it published the column written by Pipes, just as we had concluded in *Gaudette II* that the nonadvocacy reporting of current events was not petitioning activity, *see* 2017 ME 87, ¶ 15, 160 A.3d 539. *Franchini*, 383 F. Supp. 3d at 64-65. On that basis, the court denied IBD's special motion to dismiss. *Id.* at 64-66.

[¶34] After the district court issued its order, IBD filed an interlocutory appeal to the First Circuit. *Franchini*, 981 F.3d at 6. In the resulting opinion, the First Circuit made clear its own reading of the record, which was that IBD chose to publish Pipes's column—which she herself described as a "call to action"—to advance its own "editorial effort" to affect public policy. *Id.* at 3, 6; *see supra* n.12. The First Circuit also construed the record to establish that "IBD selected a columnist [Pipes] with a particular viewpoint that aligned with its own. Both the columnist's and IBD's views are discernible from the Op-Ed." *Id.* at 10.

[¶35] The court then summarized the parties' competing assertions about whether our holding in *Gaudette II* was determinative of the applicability of section 556 to Franchini's defamation claim. That synopsis recited IBD's contentions that the statute applied directly to protect its own publishing activity and also that IBD should benefit vicariously from the protections

created by section 556 because the statute would have resulted in the dismissal of a claim against Pipes if she were a party to the action.[14]  *Id.*  In the end, however, the court focused on *Gaudette II*'s footnote 3, observing that we had reserved the issue that would be dispositive of IBD's special motion to dismiss and concluding that the determination of that issue "is appropriately resolved by the Maine Law Court."  *Id.*  Accordingly, retaining jurisdiction, the First Circuit certified the following question to us: "Should IBD's special motion to dismiss be granted under [14 M.R.S. § 556]?"  *Id*. at 10-11.  The court also stated that it would "welcome any further comments the Law Court may have on relevant Maine law."  *Id.*

## C.  **Propriety of Certification**

[¶36]  Despite the absence of advocacy from the parties about whether it would be proper for us to accept the certified question, the Court today declines to answer it, primarily on one ground—that governing legal principles already exist in "clear precedent that applies to the dispute."[15]  Court's Opinion ¶ 21.

---

[14]  Franchini failed to properly include Pipes as a party due to both the lack of proper service and the absence of personal jurisdiction.  *Franchini*, 981 F.3d at 6 n.3.

[15]  The Court also states that "we could decline to answer" the question because it is not one of law, although the Court goes on to infer a question of law.  Court's Opinion ¶ 13.  For the reasons I offer in the text, rejecting the certified question at issue, as the Court insinuated it could do, would have constituted a departure from both our established practice of reframing a certified question

I agree that if this were true and such precedent existed, we would be without statutory authority to accept the question. *See* 4 M.R.S. § 57. But I respectfully submit that this rationale for the Court's rejection of the question is wrong. There is *no* precedential authority on the issue generated in this case; rather, Maine's law on the question is unsettled.

[¶37] The nature of the First Circuit's inquiry must first be determined in order to consider whether precedent exists in Maine law. The First Circuit has framed the certified question in terms that would call for us to determine simply whether IBD's special motion should be granted. This is an ultimate *adjudicatory* determination, however, which remains with the federal judiciary alone because the action remains pending in federal court. Nonetheless, the court's opinion provides us with a clear understanding of the substantive *legal* issue it has referred for our consideration. Particularly when the First Circuit has presented the case to us by also inviting us in an open-ended way to comment on the issue as we see fit, I agree with the Court that we can—as we should—reformulate the question to illuminate the question of law, *see* Court's

---

when that can be done to meet the jurisdictional requirements, *see infra* ¶ 37, and our overall receptiveness toward responding to certified questions, *see supra* ¶ 26.

Opinion ¶ 13, just as we have done in the past, *see Dinan*, 2013 ME 22, ¶ 22, 60 A.3d 792.[16]

[¶38] The issue embodied in the First Circuit's question to us is evident: whether a subscription news service that is in the business of both criticizing and promoting various policy positions is engaged in petitioning activity within the meaning of Maine's anti-SLAPP statute when that entity publishes an editorial piece written by a third party about a public policy matter; the news service specifically selects that piece for publication because the column expresses a viewpoint that mirrors its own partisan views on the issue; and the publisher's partisan position is evident from the article.

[¶39] The essential question certified to us, when viewed this way, meets the four jurisdictional elements.

---

[16] We are not alone in having reframed a certified question. *See, e.g.*, *W. Helicopter Servs., Inc. v. Rogerson Aircraft Corp.,* 811 P.2d 627, 633 (Or. 1991) (stating the "majority rule" that the state court "has the discretion to reframe questions and is not bound to answer the question as certified"); *Kincaid v. Mangum*, 432 S.E.2d 74, 83 (W. Va. 1993) (stating that the court "retains the power to reformulate questions certified to it"); *Beard v. Viene*, 826 P.2d 990, 993 n.4 (Okla. 1992) (noting the "generally prevailing rule" that the state court is authorized to restate the certified question); *see also Meckert v. Transamerica Ins. Co.*, 742 F.2d 505, 507 (9th Cir. 1984) ("We do not intend this formulation [of the certified question] to be exclusive. The [state court] is free to frame the basic issues in any appropriate manner."); *Barnes v. Atl. & Pac. Life Ins. Co.*, 530 F.2d 98, 99 (5th Cir. 1976) (stating that, "following our usual practice, we left it to the [state court] to formulate the issues. As was their prerogative, the [state court] did just that and considered the basic issues rather than replying categorically to the certified questions."); John B. Corr & Ira P. Robbins, *Interjurisdictional Certification and Choice of Law*, 41 Vand. L. Rev. 411, 426 (1988) ("[T]he answering court must have the power to reformulate the questions posed. . . . The answering court may be best situated to frame the question for precedential value and to control the development of its laws.").

24

[¶40]  First, as I discuss above, *see supra* ¶¶ 28-29 & n.12, the question is unencumbered by any dispute of material fact.

[¶41]  Second, it presents a question of law.  The issue focuses directly and entirely on the first step of the analytical framework attendant to an anti-SLAPP special motion to dismiss—specifically, whether at the time of the allegedly actionable conduct, given the circumstances described by the First Circuit, IBD was engaging in petitioning activity, which is the gateway inquiry that determines whether the anti-SLAPP statute applies at all.[17]  *Franchini*, 981 F.3d at 10 n.8; *see, e.g.*, *Desjardins v. Reynolds*, 2017 ME 99, ¶ 8, 162 A.3d 228.  We have stated several times that this first step in the anti-SLAPP inquiry is "purely a question of law for the court's decision."  *Gaudette v. Davis* (*Gaudette I*), 2017 ME 86, ¶ 16, 160 A.3d 1190, *abrogated in part by Thurlow v. Nelson*, 2021 ME 58, ¶ 19, 263 A.3d 494; *see also Desjardins*, 2017 ME 99, ¶ 8, 162 A.3d 228.  Consequently, the question of whether IBD's publication of the

---

[17]  Pursuant to our case law at the time the First Circuit certified the question to us, the disposition of a special motion to dismiss a SLAPP suit could have triggered as many as three analytical steps. *See, e.g.*, *Desjardins v. Reynolds*, 2017 ME 99, ¶¶ 8-10, 162 A.3d 228.  *But see Thurlow v. Nelson*, 2021 ME 58, ¶ 19, 263 A.3d 494 (modifying our application of section 556 by holding that there now can be up to only two such steps).  Because the First Circuit determined that the remaining elements of IBD's anti-SLAPP special motion to dismiss were satisfied, the sole remaining issue is the one presented to us here—whether IBD engaged in petitioning activity by publishing Pipes's column. *See Franchini*, 981 F.3d at 10 n.8.

Pipes article constituted petitioning activity is a question of law, thereby satisfying that jurisdictional requirement created in section 57.

[¶42]   Third, one possible answer to this question is dispositive of Franchini's defamation claim against IBD because, given the First Circuit's determination that the remaining aspects of an anti-SLAPP special motion to dismiss were satisfied here, *see supra* n.17, if we were to conclude that IBD's publication of the Pipes column constituted petitioning activity by IBD, then IBD would be entitled to a favorable disposition of its motion, meaning that the claim itself would be dismissed in federal court, which retains jurisdiction.  *See Bankr. Est. of Everest*, 2015 ME 19, ¶ 13, 111 A.3d 655.

[¶43]  This leads to the fourth and final elemental issue—the one where I part ways with the Court—which is whether there exists "clear controlling precedent[]" that already provides an answer to the certified question.  4 M.R.S. § 57; *see also Jackson Brook Inst., Inc. v. Me. Ins. Guar. Ass'n*, 2004 ME 140, ¶ 1, 861 A.2d 652.  Here, the Court points to our opinion in *Gaudette II* as establishing precedential authority on the issue raised in the question. I respectfully submit that the Court is incorrect.

[¶44]   *Gaudette II* answers a very different question than the one presented here and therefore does not provide precedent for this action.  The

26

holding in *Gaudette II* establishes only that when a newspaper publishes a factual account of current events, the publisher is not engaged in petitioning activity for purposes of the anti-SLAPP statute. *Gaudette II*, 2017 ME 87, ¶¶ 15, 17, 160 A.3d 539. The federal case at issue here presents just the opposite situation—it centers on the publication of the publisher's own *partisan* views, where the publisher decided to publish the advocacy piece because the publisher agreed with the viewpoint expressed in the column and that alignment is apparent from the published piece. *Gaudette II* therefore does not have precedential bearing on the legal issue presented here.

[¶45] In extending *Gaudette II*'s purported reach, the Court relies on statements we made in that opinion that a publisher is not petitioning "[u]nless a newspaper is petitioning on its own behalf" and that "Maine's anti-SLAPP statute is not applicable to newspaper articles unless those articles constitute the newspaper petitioning on its own behalf or the party seeking to invoke the anti-SLAPP statute is a party that used the newspaper to broadcast the party's own petitioning activities." *Id.*; *see* Court's Opinion ¶¶ 16, 18. For two reasons, those statements are not precedentially responsive to the First Circuit's inquiry.

[¶46]   First, the statements in *Gaudette II* quoted above are dicta and therefore do not rise to the level of "clear controlling precedent[]," 4 M.R.S. § 57. A dictum is "an opinion by a court on a question that is directly involved, briefed, and argued by counsel, and even passed on by the court, but that is not essential to the decision." *Est. of Dresser v. Me. Med. Ctr.*, 2008 ME 183, ¶ 15 n.8, 960 A.2d 1205 (Mead, J., dissenting) (quoting Black's Law Dictionary 485 (8th ed. 2004)).   As the First Circuit itself has stated, dicta are "observations relevant, but not essential, to the determination of the legal questions then before the court.  Dictum constitutes neither the law of the case nor the stuff of binding precedent.  In short, dictum contained in an appellate court's opinion has no preclusive effect in subsequent proceedings in the same, or any other, case." *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992) (citations omitted).  In short, a dictum is not precedential— it is neither authoritative nor binding.

[¶47]   In *Gaudette II* we were *not* deciding the issue presented here, which is whether publication of advocacy content amounts to petitioning activity. The statements we made in *Gaudette II* that the Court now says dispose of that issue were therefore extrinsic and far from essential to the issue actually presented there, which was whether straight news reporting—rather than

advocacy or editorializing, as is the situation here—constitutes the exercise of petitioning rights. Our statements in *Gaudette II* about the legal effect of facts that were *not* before us in that case are dicta and thus not precedential.

[¶48] Second, in the footnote that the First Circuit emphasized, we stated explicitly, "Because the news reports at issue in this appeal do not constitute petitioning activity, we need not speculate on when news reporting or editorializing might constitute petitioning activity." *Gaudette II*, 2017 ME 87, ¶ 18 n.3, 160 A.3d 539. Footnote 3 therefore serves to properly limit *Gaudette II*'s holding to the factual circumstances of that case and explicitly leaves unresolved, for another day and some future case, the question presented here—whether editorializing, which is what IBD was doing, or even some forms of news reporting can be petitioning activity pursuant to Maine's anti-SLAPP statute. Thus, whatever force may be assigned to the dicta in the text—and, for the reasons I offer above, any force it may have certainly falls short of being binding authority—is undercut by the reservation in the footnote. At the very least, the tension between the textual dicta and the footnote leaves the effect of the former enigmatic and materially uncertain.

[¶49] For these reasons, the language in *Gaudette II* invoked by the Court falls short of generating "clear controlling precedent[]," *see* 4 M.R.S. § 57, on the

issue presented to us by the First Circuit. The effect of that language is not "clear" given the limitation in the footnote, and it does not rise to the level of "controlling precedent[]" because the language itself is merely dictum.[18]

[¶50] Paradoxically, by stating that, in *Gaudette II,* we already definitively articulated the legal principles that bear on the certified question, Court's Opinion ¶¶ 16, 18, the Court may be seen to be now prescribing, substantively, the law that the federal courts can apply to the undisputed facts in this case. We have not, in fact, answered the question presented here. Any substantive pronouncement of law that can be extracted from the Court's Opinion arises entirely from the Court's erroneous view about the scope of our holding in *Gaudette II* and not from a merits analysis of the applicable law itself. It *may* be that, following an actual examination of the legal merits germane to the issue the First Circuit has presented to us, we would conclude as a matter of law that IBD had not engaged in petitioning activity, just as was the case with Mainely Media. But that remains to be seen because, to date, we have not

---

[18] The Court states that any answer we might provide to the certified question "will not answer how the next case will be decided." Court's Opinion ¶ 18. To the contrary, however, a substantive response here *would* have jurisprudential effect by answering the legal question left open in *Gaudette II* and creating precedent that can be invoked to adjudicate future cases involving facts similar to those presented here.

embarked on that analytical journey—not in the past, and not, in any proper way, today.

[¶51] I point out finally and more generally that our jurisprudential efforts to properly interpret and determine the proper use of section 556 and the process governing it have been valiant, but the results have been nothing short of fluid. This is best demonstrated by multiple significant changes in our case law, over a relatively short period, relating to the procedure that we have struggled to create when a court is called upon to adjudicate a section 556 anti-SLAPP special motion to dismiss—attempts to construe the statute in a way that would be true to the Legislature's intent while also protecting the significant constitutional interests held by the litigants. In *Nader v. Maine Democratic Party*, 2012 ME 57, ¶ 36, 41 A.3d 551, we changed the then-existing procedural framework applicable to such motions, which had been in effect for more than a decade, since our decision in *Morse Brothers v. Webster*, 2001 ME 70, ¶¶ 19-20, 772 A.2d 842. Then, in *Gaudette I*, 2017 ME 86, ¶ 18, 160 A.3d 1190, we changed the framework we had created in *Nader*. And most recently, in *Thurlow v. Nelson*, 2021 ME 58, ¶ 19, 263 A.3d 494, we changed—yet again— the process for adjudicating these motions by eliminating the modifications we had made in *Gaudette I*. If anything, the problems inherent in section 556, and

our continuing efforts to fashion a constitutionally sound and workable process to implement the statute, make it difficult to conclude with assurance that there is "clear controlling precedent[]" for much of anything related to that statute. 4 M.R.S. § 57.

**D.    Conclusion**

[¶52]  As a general principle, when a federal court seeks our guidance, we do—and should—view certification of questions generously to promote the important objectives of that process.   More particular to this case, the jurisdictional predicate for the certified question is fully present, and the reasons to address it are persuasive.   The First Circuit determined that the question presented here raises "an important issue of law" that "implicates important societal interests in both First Amendment protections for media outlets, and the substantive statutory rights created under Maine law." *Franchini*, 981 F.3d at 7.  As a matter of federalism and comity, we should take seriously both this assessment and the First Circuit's choice to certify the question so that we may provide material guidance on an open legal issue arising from Maine's own law.   We should not leave the federal court to hypothesize how we might resolve this unsettled and important question of Maine law.

32

[¶53]  For these reasons, we should accept and answer the question certified to us by the First Circuit.  I respectfully dissent from the Court's decision to the contrary.

---

Russell B. Pierce, Jr., Esq. (orally), Norman, Hanson & DeTroy, LLC, for appellant Investor's Business Daily, Inc.

Jens-Peter W. Bergen, Esq., Kennebunk, and Raymond W. Belair, Esq. (orally), Belair & Associates, P.C., New York, New York, for appellee Thomas Franchini

United States Court of Appeals for the First Circuit docket number 19-1389